**STANDARD OIL COMPANY OF CALIFORNIA**

v.

**The UNITED STATES.**

No. 208–77.

United States Court of Claims.

June 30, 1982.

es that the United States breached various provisions of a complex and intricate contract that governs the production of oil from the Elk Hills Naval Petroleum Reserve in California. The dispute relates to the amount of oil that Standard was entitled to receive out of the production of the Reserve.

The petition contains four counts, each charging a breach of a different provision of the contract. Standard has moved for summary judgment on the first three counts, and the government has cross-moved on the first count. This opinion grants summary judgment in favor of Standard on counts I and II. Our decision on count III will be the subject of a subsequent opinion.

I.

Because the facts relating to counts I and II are complicated and technical and largely unrelated, we shall set them forth in detail in our discussion of those counts. In this portion of the opinion we describe the background of the contract, its negotiation, and its principal features. Unless otherwise indicated, the facts are taken from the stipulation the parties filed on November 3, 1980.

In the early part of this century, the United States was disposing of its public lands in the West at an accelerating pace. At the same time, the country was developing an awareness of the strategic importance of the minerals underlying those lands. In particular, the Navy, which then was transforming its fleet from coal- to oil-powered vessels, was in acute need of an adequate supply of petroleum.

By a series of Executive actions from 1909 to 1910, the government withdrew more than 3 million acres of oil lands in Wyoming and California from entry under the public land laws. In 1912, President Taft, by Executive order, placed a significant portion of those lands in the Naval Petroleum Reserve No. 1, Elk Hills, Califor-

Robert M. Westberg, San Francisco, Cal., attorney of record, for plaintiff. Thomas E. Haven, Pamela Phillips, and Pillsbury, Madison & Sutro, San Francisco, Cal., of counsel.

Andrew F. Walch, Washington, D. C., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D. C., for defendant. Larry R. Rowe, Dept. of Energy, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and KUNZIG * and BENNETT, Judges.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge:

In this suit, the plaintiff, Standard Oil Company of California ("Standard"), alleg-

---

* Before he died, Judge Kunzig participated in the oral argument in this case and agreed to the disposition of the portions of this case made in this opinion.

nia (the "Reserve"). The Reserve was to be held for the exclusive use and benefit of the United States Navy (the "Navy"). Those Executive orders remain in effect.

In the Naval Appropriations Act of June 4, 1920, Pub.L.No. 66–243, 41 Stat. 812, 813 (codified as amended at 10 U.S.C. § 7426(a) (1976)), Congress directed the Secretary of the Navy (the "Secretary") to manage the Reserve. Under that act, the Secretary was authorized "to conserve, develop, use, and operate [the naval reserves] in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States."

The government did not own or lease all of the lands and underlying hydrocarbons in the Reserve. The Secretary's authority under the 1920 act to manage the Reserve was designed to assure the pre-existing rights of private owners and lessees, who could continue to exploit their interests in the Reserve. Nevertheless, because of the geophysics involved, private exploitation threatened to drain adjacent Navy lands and so to thwart the government's objective of conserving its oil in the ground. The contract involved in this suit, known as the Unit Plan Contract, was designed to alleviate this problem.

Apparently by the late 1930's, the major (if not the only) private owner and lessee in the Reserve was Standard. After President Roosevelt expanded the Reserve in 1942, Standard owned approximately 20 percent of the petroleum and hydrocarbons in the Reserve. Standard and the Navy had an understanding before 1942 that each would give the other six months' notice before drilling wells inside the Reserve.

Because of the problem of private wells draining the oil from under the Navy's land, Congress by the act of June 30, 1938, Pub. L.No. 75–786, 52 Stat. 1252, 1253 (amending the 1920 appropriations act), authorized the Secretary "to contract with the owners and lessees of land within or adjoining such reserves for conservation in the ground of oil and gas . . . ." It was hoped that the Secretary would be able to reach agreements with private parties in order to eliminate the drainage problem. If, however, voluntary agreements could not be obtained, the 1938 amendment authorized the Secretary, with the approval of the President, to acquire the privately held lands.

Pursuant to his authority under the 1938 amendment, the Secretary entered into negotiations with Standard. One result was a joint Navy-Standard engineering report, issued in 1942, which estimated the respective shares of the parties in the three commercially productive zones within the Reserve (the Dry Gas Zone, the Shallow Oil Zone, and the Stevens Zone).[1] The primary outcome, however, was a tentative agreement in 1943 to "unitize" the Reserve—that is, to operate the Reserve as a single unit and to allocate costs and the oil produced on the basis of the parties' respective interests (*i.e.,* shares) in the underlying petroleum and hydrocarbons.

The agreement (referred to where appropriate as the "preliminary Unit Plan Contract") gave the Navy sole control over the time and rate of production from the entire Reserve. The preliminary Unit Plan Contract therefore enabled the Navy to assure the conservation of the Navy's oil in the ground and the most efficient production of the Reserve, without the expense of acquiring Standard's interest in the Reserve. In return, Standard was assured production of a certain amount of its share of oil (see below).

Prior to executing the preliminary Unit Plan Contract, the Secretary submitted it to the Attorney General for his opinion on its legality. Because unitization is such an effective means of oil conservation, the Attorney General could not say "that such a form

---

1. A commercially productive zone is defined in the Unit Plan Contract as a "[g]eologic strat[um] beneath the surface of the earth which, in the opinion of the Engineering Committee, contain[s] oil and/or gas bearing formations capable of producing oil or gas in paying quantities." The zones are horizontal planes, lying vertically parallel to each other.

of contract is unauthorized by the statute." H.R.Rep.No.1529, 78th Cong., 2d Sess. 11 (1944). He concluded, however, that since Congress never specifically discussed unitization in enacting the 1938 act, the preliminary contract "should not be executed without more specific approval by the Congress." *Id.*

In response, Congress passed the act of June 17, 1944, Pub.L.No. 78–343, 58 Stat. 280–81 (amending the 1920 appropriations act), in part to provide the Secretary with such authority. The 1944 act amended the 1920 act, as amended in 1938, to authorize the Secretary, *inter alia,*

> to explore, prospect, conserve, develop, use, and operate [the naval reserves] in his discretion, subject to approval by the President, directly or by contract, lease, or otherwise, including, in the case of naval petroleum reserve numbered 1, contracts for joint, unit, or other cooperative plans of exploration, prospecting, conservation, development, use, and operation of lands owned or controlled by the United States within such reserve numbered 1 and lands (a) owned or leased by private interests therein, or (b) outside thereof but on the same geologic structure, such use and operation to be for the protection, conservation, maintenance, and testing of the aforesaid reserves, or for the production of petroleum whenever and to the extent the Secretary, with the approval of the President, finds required for the national defense: *Provided, however,* That no petroleum shall be produced pursuant to such a finding unless authorized by the Congress by joint resolution . . . .
>
> Any contract entered into pursuant to the authority granted in the preceding paragraph for joint, unit, or other cooperative plan of exploration, prospecting, conservation, development, use, or operation shall require that the United States be assured of receipt currently of its share of the total production from each of the various commercially productive zones underlying all lands covered by the contract as determined from time to time on the basis of estimates of its original share of the quantities of recoverable oil, gas, natural gasoline and associated hydrocarbons in such zones underlying such lands on the date fixed in such contract: *Provided, however,* That any party to such a contract, other than the United States may, pursuant to the authority hereinabove granted to use and operate the reserves for their protection, conservation, maintenance and testing, be permitted under the terms of such contract to have produced and to receive and shall have charged to its share in the total production from any zone or zones such quantities of petroleum as are necessary to compensate it—
>
> > (a) for its share of the current expenses of protecting, conserving, testing and maintaining in good oil-field condition such lands and the wells and improvements thereon, and its real and personal taxes levied or assessed thereon; and
> >
> > (b) for surrendering control of the rate of production from its lands: *Provided,* That if the Secretary of the Navy is not then causing petroleum to be produced pursuant to a joint resolution as referred to in the preceding paragraph, the quantity of petroleum determined to be produced under this subparagraph (b) may, in the absolute discretion of the Secretary, be terminated or reduced at any time on reasonable notice.
>
> Such quantities permitted to be produced pursuant to the foregoing subparagraphs (a) and (b) shall in no event, however, exceed one-third of its share of the estimated recoverable petroleum on such date fixed in such contract in such zone or zones; and no such contract shall be entered into without prior consultation in regard to all its details with the Naval Affairs Committees of the Congress.

The 1944 amendment was designed also to clarify the Secretary's authority to produce petroleum. He was authorized to produce an amount necessary for the "protection, conservation, maintenance, and testing" of the Reserve. In addition, he could produce an amount "required for national

defense" when "authorized by the Congress by joint resolution" to do so.

Standard and the Navy amended the preliminary Unit Plan Contract to reflect the clarifications of the Navy's authority in the 1944 amendment and other specific concerns of the House Committee on Naval Affairs. *See* H.R.Rep.No.1529, *supra.* Two days after the passage of the 1944 amendment, Standard and the Navy entered into the Unit Plan Contract.

The provisions of the Unit Plan Contract here involved have remained essentially the same since the contract was executed in 1944. The primary objective of the contract is the conservation of oil in the ground rather than the regulation of production. In exchange, *inter alia,* for acquiescing in the curtailment of production from its lands in the Reserve and for surrendering control over the rate of exploration, prospecting, development, operation and production (see Unit Plan Contract—hereinafter cited UPC—sections 3(a), 4), Standard was entitled to receive immediately up to 25 million barrels (later increased to approximately 28 million barrels) of its share of oil in the Shallow Oil Zone, or one-third of its share of recoverable oil in that zone, whichever was less. *See* UPC section 5(d). The period over which Standard was to receive this oil (ending for practical purposes in August 1950) is referred to in the contract as the "primary period."

Over the productive life of the Reserve, the Unit Plan Contract contemplates that the United States and Standard will receive their respective ownership interests ("percentage participations") in each of the productive zones.[2] During the primary period, however, application of section 5(d) resulted in Standard's receiving 28,210,593 barrels of the 40,926,702 total barrels produced from the Shallow Oil Zone. Because Standard's percentage participation in that zone was only about 30 percent, Standard during the primary period received 14,670,075 barrels

of oil more than it would have received if the production had been allocated on the basis of the parties' percentage participations.

As additional consideration to Standard for its agreement to the Unit Plan Contract, section 5(f) of the contract entitles Standard to receive a daily quantity of oil, the value of which is equal to Standard's share of "the current expenses of protecting, conserving, testing, and maintaining the Reserve in good oil-field condition" plus the taxes assessed against Standard's land and equipment in the Reserve. The oil Standard receives under section 5(f), like that it received under section 5(d), is to be counted against Standard's percentage participation. In other words, sections 5(d) and 5(f) of the Unit Plan Contract do not entitle Standard to receive any of the Navy's oil, but only to receive its own oil in the Reserve sooner than it otherwise would under the other provisions of the contract.

From the end of the primary period until 1967, all production from the Reserve was allocated according to section 5(g). (The proper interpretation of section 5(g) is the subject of count III, which will be resolved in a subsequent opinion, *see supra,* at p. 2.) That section limits Standard under certain conditions to one-third of the amount of oil it would have been entitled to receive based upon its percentage participation in the Reserve. During that period, Standard received one-third of its percentage participation share of production from the Shallow Oil Zone while the government received its entire percentage participation plus two-thirds of Standard's share. Until October 1964, the production allocated to Standard under section 5(g) was sufficient to cover its current expenses and taxes connected with the Reserve. Only after that time did the parties believe it necessary to invoke section 5(f). No oil actually was allocated under section 5(f) until 1967, however, because of a dispute concerning the interpretation of sections 5(f) and 5(g).

---

**2.** Although the percentage participations have changed over time (as a result of the application of section 2(f) of the Unit Plan Contract), the present participating percentages, according to the stipulations, are:

|  | *United States* | *Standard Oil* |
|---|---|---|
| *Shallow Oil Zone* | 70.0119% | 29.9881% |
| *Stevens Zone* | 83.5073% | 16.4927% |

## II. COUNT I OF THE PETITION

In count I, Standard contends that the government violated section 5(f) of the Unit Plan Contract in determining the amount of oil Standard was entitled to receive from the Reserve between mid-1973 and the end of 1976, during which period government oil-price controls were in effect.

Section 5(f) provides in part:

If, at any time, Navy shall elect (see paragraph (8) of the Recitals) to suspend or to reduce production from the Reserve, Standard shall nevertheless, subject to the other provisions of this paragraph (f), be permitted to receive a daily quantity of production from the Reserve, the value of which, averaged over each quarterly period, shall equal the sum of (1) Standard's share of the current expenses of protecting, conserving, testing, and maintaining the Reserve in good oil-field condition, and (2) the real and personal taxes levied or assessed against Standard's lands and equipment and/or its rights and interests under this contract. In determining the quantity of such production, the value of crude oil and natural gasoline shall be measured by the average posted market price offered and paid for crude oil and natural gasoline of similar gravity, quality and grade in Kern County, California by the major oil purchasing companies, excluding Standard, at the time such crude oil and natural gasoline are run, (the price so used to be in no event less than Standard's posted price). . . .

In other words, the amount of oil Standard was to receive was to be determined by reference to the "average posted market price offered and paid" for similar oil in Kern County, California. As that price increased, the quantity of oil to which Standard was entitled decreased; conversely, Standard's entitlement increased as the price decreased.

The calculation of the volume of Standard's entitlement under this provision, once the level of its costs had been determined (see part III, infra), generally was uncontroversial until August 1973. On that date, the Federal Energy Administration ("FEA") or its predecessor agencies imposed controls upon the maximum price of certain categories of domestic crude oil (pursuant first to the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904, note (1976), and then to the Emergency Petroleum Allocation Act of 1973, Pub.L.No. 93–159, 87 Stat. 627 (codified as amended at 15 U.S.C. § 751 et seq. (1976 & Supp. IV 1980)).

The Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212 (1981) ("price regulations"), established a maximum price for the "first sale" of "old oil" (i.e., the volume of oil being produced from a property in 1972). Until February 1, 1976, "new oil" (i.e., the volume of oil in excess of 1972 production including the entire volume from properties first produced after 1972) could be sold without regard to price control; after February 1, 1976, however, new oil became subject to a higher, "upper tier" ceiling price (10 C.F.R. § 212.74 (1981)).

The effect of the regulations was that for "crude oil ... of similar gravity, quality and grade" there were two "average posted market price[s] offered and paid" by the major oil purchasing companies in Kern County, California—one for new oil and one for old oil. At all relevant times, the price for new oil was higher than that for old oil. For example, on January 1, 1975, the price in Kern County for a barrel of 20 gravity old oil was $4.35, while a barrel of the same gravity new oil sold for $10.29.

From the imposition of the crude-oil price controls in August of 1973 through the end of 1976 (the period covered by count I), the FEA pricing regulations applied to Standard's share of current Reserve production. Although Standard transferred its share of Reserve production to affiliated entities, the price regulations required that Standard impute the applicable "first sale" price to the transfers. During that period, the crude oil Standard received was composed of both old and new oil.

Beginning in September 1973, the unit operator (apparently a Navy employee) calculated Standard's 5(f) entitlement under

the assumption that FEA regulations applied to the pricing of that oil. The stipulations do not indicate, however, the way in which the unit operator took account of those regulations.

In April 1975, the Navy informed Standard that in its opinion oil produced from the Reserve was not subject to the FEA price controls and that the allocation of Reserve production allocated to Standard under 5(f) would be recomputed. Under the Navy's theory, the result apparently was that Standard's entitlement would be determined on the basis of a noncontrolled price of oil.

For several months Standard received no oil from the Reserve because of the Navy's opinion that Standard had received an over-allotment in view of the way the value of the oil was calculated. Delivery to Standard was resumed in October 1975, but the value of the oil was calculated on the assumption that the FEA price controls were inapplicable.

In *Mohawk Petroleum Corp. v. Department of the Navy*, 521 F.2d 1394 (Temp. Emer.Ct.App.1975), the court affirmed an injunction requiring the Navy to continue to supply Reserve petroleum under a 1970 contract to Mohawk "at prices controlled and fixed by" the FEA. The court rejected the Navy's contention that application of the price controls to oil produced on the Reserve would frustrate the purpose of the 1944 act (10 U.S.C. § 7422(b)(1) (1976)) of conserving production on the Reserve.

In count I of the petition, Standard seeks damages on the theory that it received less oil than it was entitled to under section 5(f) after August 1973. It argues that it was entitled to receive the amount of oil that, when valued pursuant to the prices set in the FEA regulations, including the two-tier pricing system for old and new oil, would equal its expenses of "protecting, conserving, testing and maintaining" the Reserve plus its taxes assessed with respect to the Reserve.

A. The government's primary response to this claim is that the claim is not properly before us.

■ 1. The government first contends that Standard failed to exhaust its administrative remedies. It argues that before bringing this suit, Standard should have sought relief from the price control regulations by applying to the FEA either for a ruling that the regulations were inapplicable to the Reserve or for an exemption from the price controls. *See* 10 C.F.R. § 205.-50–.86 (1981).

The Unit Plan Contract, however, contains no provision requiring such exhaustion of administrative remedies before suit may be brought. Although the FEA price controls did not exist when the Unit Plan Contract was drafted, there were other wartime price controls in effect at that time. *See* Emergency Price Control Act of 1942, Pub.L.No. 77–421, 56 Stat. 23 (codified as amended at 50 U.S.C.App. §§ 901 *et seq.* (Supp. III 1943)). The parties certainly were aware of at least the possibility that price controls would be imposed on crude oil including Reserve production; yet the Unit Plan Contract makes no mention of the administrative procedures for seeking relief from price controls. If the parties had intended to require the invocation of such remedies, presumably they would have so provided. At most, application to that administrative body was a permissive administrative remedy, which Standard was not required to exhaust before filing suit here. *See, e.g., Pacific Far East Line, Inc. v. United States*, 184 Ct.Cl. 169, 197–98, 394 F.2d 990, 1005–06 (1968).

The FEA, whose administrative proceedings the government says Standard should have invoked, had nothing to do directly with the contract. The agency's procedures, therefore, cannot be viewed as having been implicitly incorporated in the contract.

The government argues that if Standard had sought relief from the FEA, it would have obtained relief excepting it from the price control regulations and therefore would have achieved the same result it now seeks to obtain through an award of damages. This argument is wholly speculative

since we cannot now say what the FEA would have done if the question had been presented to it. In any event, that is a matter more appropriately to be considered in determining damages.

2. Section 3(b) of the Unit Plan Contract states:

All exploration, prospecting, development, and producing operations on the Reserve shall be carried on under the supervision and direction of an Operating Committee consisting of two petroleum engineers, one of whom shall be appointed by and shall represent Navy and the other shall be appointed by and shall represent Standard. Each appointee shall have had at least ten (10) years' experience as a petroleum engineer, or if a graduate engineer, at least five (5) years' such experience. . . . Subject to the other provisions hereof, the Operating Committee shall perform the following functions:

(1) Determine the number of wells to be drilled on the Reserve necessary to secure and to maintain production under this contract, and the location and depth of each well.

(2) Determine the rate at which each well should be produced in accordance with sound oil field engineering practices.

(3) Inspect and supervise all exploration, prospecting, development, and producing operations on the Reserve.

(4) Require the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the Reserve.

(5) Act with respect to such other matters as may be elsewhere herein provided or as may hereafter be referred to the Committee from time to time by both Navy and Standard.

Section 9 of the contract, captioned "Determination of Disputes," provides in pertinent part:

(a) In the event the Operating Committee is unable to agree upon any matter arising in the performance of its func-

tions, such matter shall be referred to the Secretary of the Navy for determination; and his decision in each such instance shall be final and shall be binding upon Navy and Standard.

■ The government contends that Standard was required to refer the question of the relationship of the FEA regulations and section 5(f) of the Unit Plan Contract to the Operating Committee and that its failure to do so bars it from now litigating the issue before this court. We conclude, however, that "a fair reading of the . . . contract shows that the specific dispute [i.e., interpretation of section 5(f) in the context of FEA price regulations] has not been committed to agency [i.e., the Operating Committee] decision." *Len Co. & Associates v. United States*, 181 Ct.Cl. 29, 36, 385 F.2d 438, 442 (1967). Accordingly, the failure of Standard to submit the dispute to the Operating Committee and, if it lost there, to the Secretary, does not bar the suit. *E.g., id.*, 385 F.2d at 442.

Under section 3(b) of the contract, the authority of the Operating Committee is over the operation and management of the Reserve. The section gives the Operating Committee supervision and direction of "all exploration, prospecting, developing, and producing operations on the Reserve." This language refers to matters of oil field engineering and management. This conclusion is confirmed by the enumeration of the five categories of specific functions the Operating Committee "shall perform," including such technical and specialized matters as determining the number of wells to be drilled (UPC section 3(b)(1)) and determining "the rate at which each well should be produced in accordance with sound oil field engineering practices" (UPC section 3(b)(2)).

Both members of the Operating Committee must be experienced engineers. There is nothing in the contract to indicate that the parties intended to commit to those individuals' authority the resolution of disputes concerning the interpretation and application of the contract. The question raised in count I does not require the appli-

cation of engineering skills. It involves the interpretation of the contract to determine the basis for setting Standard's entitlement to oil from the Reserve. This is a question ordinarily decided by lawyers and judges, not by engineers.

Furthermore, if the matter were within the authority of the Operating Committee, any disagreement between the members would have to be referred to the Secretary, and his decision would be "final and binding upon Navy and Standard" (UPC section 9(a)). It is difficult to believe that Standard intended to give the Secretary final authority to interpret and apply the complex provisions of this important contract that involves a significant segment of Standard's oil reserves and production. If the parties had intended to require that disputes over the meaning and application of the contract were to be submitted to the Operating Committee, presumably they would have explicitly so provided. We think that the Operating Committee's authority was intended to extend only to determining engineering and management issues relating to the operational problems of the Reserve.

The government points to an exchange of correspondence between Chairman Carl Vinson of the House Naval Affairs Committee and R. Keith Kane, Special Assistant to the Secretary of the Navy at the time of the hearings on the 1944 act. In response to a question from Chairman Vinson, Mr. Kane stated (in "Memorandum of Comments in Reply to Chairman Vinson's Letter of February 5, 1944," at p. 14):

> This supervisory and directory power residing in the Operating Committee is intended to be as broad in respect of *practical day to day engineering matters* as it is possible to make it within the limits of language. It is the purpose of Navy and Standard, as the owners or proprietors beneficially interested in the operating results, to make the Operating Committee the real and only authority with respect to what is or may be done *from day to day in the field within the framework of established policy.* [Emphasis added.]

Rather than supporting the government's position, this excerpt undermines it. The Operating Committee's broad power was over "practical day to day engineering matters" and it was to exercise that authority "within the framework of established policy." There is no indication that the Operating Committee was empowered to establish or alter that policy. The interpretation of section 5(f) in light of FEA price regulations involves a question of policy, not of "day to day engineering."

The Operating Committee itself apparently did not believe it had authority to resolve a dispute concerning the applicability of the FEA price regulations. After the Navy insisted that Standard's entitlement under section 5(f) be valued without regard to FEA price controls, Standard's representative on the committee signed the Operating Minutes subject to the following reservation:

> Standard does not agree that it is a function of the Operating Committee to determine the value of crude oil for the purposes of Section 5(f). Nevertheless, in order for Standard to receive currently at least part of the crude oil to which it is entitled, Standard's Member of the Operating Committee is signing this minute with full reservation of rights as expressed above.

Next, the government contends that the parties in fact referred the matter to the Operating Committee. Section 3(b)(5) authorizes the Operating Committee to "[a]ct with respect to other matters ... as may hereafter be referred to the Committee from time to time by both Navy and Standard."

According to the government, correspondence between the Navy and Standard from February through May of 1967 establishes that the parties submitted a dispute concerning the application of section 5(f) to the Operating Committee. During that period the parties were attempting to negotiate a means by which Standard for the first time might receive oil under section 5(f). The attempt was made after the parties had submitted to the Comptroller General

several questions concerning the interpretation of sections 5(f) and 5(g) of the Unit Plan Contract. *See infra* pp. 1333–1335. The parties' objective was to develop a routine method by which the Operating Committee could handle Standard's section 5(f) entitlement.

We cannot agree with the government that this correspondence reflects a recognition by Standard that the Operating Committee had authority to determine the present contract dispute. The correspondence manifests an intent to avoid submitting the issue to the Operating Committee, and to develop a policy under which the committee would operate, pending a resolution of the dispute elsewhere. All Operating Minutes reflecting the understanding reached in that correspondence included the following statement: "It is understood that the instructions included herein shall not be binding upon either Navy or Standard as a final determination of the correct allocation of production and payment of costs."

Finally, the issue that involved section 5(f) and that was the subject of the 1967 correspondence, although similar to the issue here, was not the same (that issue is the subject of count II, discussed *infra*). There is no indication that Standard intended to submit the issue of the applicability of price regulations, as distinct from the issue in dispute in 1967, to the committee.

■ 3. The government also contends that, whatever the merits of Standard's claim, Standard suffered no damage from the reduced allocation of oil that resulted from the valuation of oil at the higher prices reflecting the Navy's refusal to apply the FEA price controls to Standard's oil produced from the Reserve. According to the government, the Navy's method of valuation only delayed Standard's receipt of the oil in the Reserve, so that by the time the Reserve is depleted (in an estimated 30 years), Standard will have received its entire percentage participation from the Reserve. As the government's brief puts it, "Standard's oil is still there, in the ground, and will ultimately be recovered by it."

The parties to the agreement, however, viewed Standard's immediate receipt of the oil to which it was entitled under section 5(f) as a valuable right under the Unit Plan Contract, without which Standard would not have entered into the contract. *See* Pub.L.No. 78–343, 58 Stat. 280; H.R.Rep. No.1529, *supra*, 11–12 (1944); UPC Recital 8. Standard seeks as damages the difference between its expenses and taxes associated with the Reserve and the amount it actually obtained for the oil it received pursuant to section 5(f). At the present stage of the case, we deal only with the issue of liability, not the issue of damages. The question of the amount that Standard may recover under count I is a matter to be determined at the damages phase of this case. At the present time, we cannot say that Standard will be unable to prove that it was damaged by the government's breach of section 5(f).

B. On the merits, Standard prevails.

■ Section 5(f) unambiguously and explicitly states that Standard is entitled to receive oil from the Reserve that, valued on the basis of the "average posted market price offered and paid" "by the major oil-producing companies" (excluding Standard) for "similar" oil in Kern County, California, will "equal the sum of (1) Standard's share of the current expenses of protecting, conserving, testing, and maintaining the Reserve in good oil-field condition, and (2) the real and personal taxes levied or assessed against Standard's lands and equipment and/or its rights and interests under this contract." During the period the FEA price controls were in effect, there were *two* "average posted market price[s] offered and paid" by the major oil-producing companies in Kern County for similar oil— one price for old oil and one for new oil. By ignoring the price controls and refusing to provide Standard with an amount of oil calculated to reflect the value that Standard actually could obtain for that oil in light of the FEA regulations, the government prevented Standard from receiving an amount of oil "the value of which ... equal[led]" Standard's share of expenses and taxes on the Reserve.

In other words, the effect of the Navy's method of calculating Standard's oil entitlement was to give Standard less than its expenses of participating in the Reserve. The parties to the Unit Plan Contract did not intend that result. *See, e.g.,* S.Rep.No. 948, 78th Cong., 2d Sess. 4–5 (1944).

Under section 5(f) of the Unit Plan Contract, Standard was entitled to have its oil allocation determined on the basis of the actual selling prices in Kern County, prices which reflected the FEA price controls.

The government makes no effort to deal with the language of the contract. Instead, it argues that even if the FEA price regulations applied to the Reserve, so that Standard could not sell all of its production from the Reserve at the higher new oil prices, the government's method of valuing Standard's oil nevertheless was justified. It argues that its method of valuation, by reducing production from the Reserve, served the overriding objective of the Unit Plan Contract and the authorizing legislation of "conserv[ing] oil in the ground."

The argument has a somewhat hollow ring. Standard was induced to enter the Unit Plan Contract on the basis of its entitlements to immediate receipt of Reserve production under sections 5(d) and 5(f). Consequently, the 1944 law and Recital 8 of the Unit Plan Contract stated that, "pursuant to the authority . . . to use and operate the [Reserve] for [its] protection, conservation, maintenance, and testing," that is, to conserve the government's oil in the ground, Standard was entitled to receive "such quantities of oil as are necessary to compensate it" for expenses and taxes. In other words, without an entitlement to enough oil to cover its expenses resulting from agreeing to the contract (as our interpretation of 5(f) provides), Standard would never have agreed to the Unit Plan Contract, and the objective of Congress to achieve conservation through unitization would have been thwarted.

■ In any event, this invocation of the basic policy of the Unit Plan Contract and the authorizing legislation cannot overcome or justify a departure from the unequivocal language of the particular provision of the contract (section 5(f)) here involved.

## III. COUNT II OF THE PETITION

Count II of the petition involves another aspect of section 5(f) of the Unit Plan Contract. The issue is whether Standard may include as part of "the current expenses of protecting, conserving, testing and maintaining the Reserve in good oil field condition," its cost of extracting (or "lifting") the oil from the Reserve. Standard contends that section 5(f) entitled it to an allotment of oil, the net value of which (after deducting the cost of producing the oil) equalled the current expenses and the taxes incurred on the Reserve. The government, on the other hand, argues that Standard is entitled to only the amount of oil necessary to cover its expenses of protecting, conserving, testing and maintaining the Reserve, but not its expenses of lifting the oil.

A. The government argues that the claim—as well as the claim in count III of the petition—is barred by laches and by equitable estoppel.

■ 1. The government's laches argument is that the claim arose in 1944, when the parties entered into the Unit Plan Contract, and that Standard's delay in bringing suit has prejudiced the government in various ways. (Although in its answer the government also alleged that the statute of limitations bars the claim, apparently it has abandoned the argument since its brief does not discuss it—perhaps because Standard seeks damages for only the six years preceding the filing of the petition.) Laches is an equitable defense that ordinarily is not applied in actions at law, where the statute of limitations governs the time limits of filing suit. *See Sumner v. United States,* 678 F.2d 202 at 205 (1982). As we stated in *Sumner,*

> This court has recognized a limited exception to this general principle, and because of the special circumstances civilian and military pay involve, has applied laches in those cases to bar certain suits filed within the statute of limitations period. *See,*

*e.g., Brundage v. United States*, 205 Ct.Cl. 502, 504 F.2d 1382 (1974), *cert. denied*, 421 U.S. 998 [95 S.Ct. 2395, 44 L.Ed.2d 665] (1975) [other citations omitted].

*Id.*

■ The court, however, has never applied laches in a breach of contract action. *See Swentek v. United States*, 208 Ct.Cl. 981, 982 (1975); *Fraass Surgical Manufacturing Co. v. United States*, 205 Ct.Cl. 585, 592, 505 F.2d 707, 710 (1974); *H & M Moving, Inc. v. United States*, 204 Ct.Cl. 696, 719, 499 F.2d 660, 672 (1974); *Kaiser Aluminum & Chemical Corp. v. United States*, 181 Ct.Cl. 902, 906–07, 388 F.2d 317, 319–20 (1967). There is no reason to depart from that settled practice in this case.

2. The equitable estoppel claim arises out of the following facts.

The present dispute between Standard and the government over whether Standard's expenses include the cost of lifting the oil dates from 1964. At the same time, the parties also disagreed on another issue involving the relationship between sections 5(f) and 5(g) of the Unit Plan Contract, which also affected the amount of oil Standard was entitled to receive. (This is the issue in count IV of the petition which is not now before us (*see supra* p. 2).) In attempting to settle both disputes, the parties agreed that in operating the Reserve, section 5(f) would be interpreted as not covering Standard's lifting costs and that the relationship between sections 5(f) and 5(g) would be as Standard asserted.

Before the settlement could be effectuated, it required the approval of the Comptroller General of the United States. In agreeing to submit the proposal to the Comptroller General, Standard · stated in writing:

> You understand, of course, that Standard's concurrence in the proposed submission to the Comptroller General is given solely to reach a settlement of all matters mentioned in the draft letter on which we have disagreed in the past. In the event that the Secretary of the Navy and the Comptroller General do not fully

approve of your recommendations as contained in the proposed letter, the interpretations agreed to by Standard shall not be deemed to be admissions by us of the correctness of any of those interpretations; and our concurrence is given on the understanding that Navy will never contend otherwise.

The Comptroller General agreed with the Navy's view that section 5(f) did not cover lifting costs, but disagreed with Standard's view of the relationship between sections 5(f) and 5(g). As a result, the settlement failed. In order to provide a means for allocating the oil pending a resolution of the disputed issues, however, the parties agreed to do so on the basis of the Comptroller General's decision. All subsequent Operating Minutes of the Operating Committee dealing with the issues, contained the following language: "It is understood that the instructions included herein shall not be binding upon either Navy or Standard as a final determination of the correct allocation of production and payment of costs."

■ Although a decision of the Comptroller General binds the government (*United States v. Standard Oil Co. of California*, 545 F.2d 624, 637–38 (9th Cir. 1976) ("*Asphalto*")), it does not bind a private party unless that party agrees to be bound. *See Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 63–64, 617 F.2d 590, 597 (1980); *Font v. United States*, 219 Ct.Cl. 335, 593 F.2d 388 (1979). In the present case, Standard agreed to be bound by the Comptroller General's decision only if he accepted both parts of the settlement. Since the Comptroller General did not do so, his decision in favor of the government on the lifting expenses issue did not bind Standard. *Cf. Sternberger v. United States*, 185 Ct.Cl. 528, 538, 401 F.2d 1012, 1018 (1968).

In *Mahoning Investment Co. v. United States*, 78 Ct.Cl. 231, 246, 3 F.Supp. 622, 629 (1933), *cert. denied*, 291 U.S. 675 (1934), we described the doctrine of equitable estoppel as follows:

[T]he vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is *sternly forbidden*. It involves fraud and falsehood, and law sternly abhors both. [Emphasis in original.]

*See also Steuer v. United States*, 207 Ct.Cl. 282, 292 (1975).

■ Standard has done nothing that would make it inequitable for Standard to recover its lifting costs. The fact that the Comptroller General's decision bound only the government but not Standard resulted not from anything Standard did but from the statutes defining the role of that official. *See Asphalto*, 545 F.2d at 637–38. The government cannot validly contend that Standard's present position disappointed any expectation upon which the government relied, since Standard made it clear at all times that it did not accept the Comptroller General's interpretation of section 5(f).

The government apparently contends that because economic conditions (primarily the price of oil) changed dramatically between 1967, when the Comptroller General's decision was issued, and 1977, when this suit was filed, it would be unfair to allow Standard to profit from its delay in filing the suit. This is but a reformulation of the government's laches argument, which we have rejected. Moreover, if this contention has any merit, it may be considered in determining the damages to which Standard is entitled.

The government also apparently argues that because in the *Asphalto* case Standard successfully argued that the government was bound by a ruling of the Comptroller General in Standard's favor on another cost issue, Standard should not be permitted now to reject the Comptroller General's ruling in favor of the government on the lifting cost issue. The short answer is that by statute the Comptroller General's ruling on the lifting issue binds only the government and not Standard (see the discussion, *su-*

*pra*). Standard is not equitably estopped from here litigating the lifting expenses issue.

■ B. Standard is entitled to include its lifting costs as part of its "share of the current expenses of protecting, conserving, testing and maintaining the Reserve." As noted, under the 1944 act, the Navy was allowed to "operate and use" the Reserve (except for national defense purposes when authorized by a joint resolution of Congress) only for the "protection, conservation, maintenance and testing" of the Reserve. Recital 8 of the Unit Plan Contract in part states:

The production of that portion of Standard's share hereinafter permitted to be produced and charged to its account under paragraphs (d) and (f) of section 5 . . . is authorized under the provision of the Act of June 4, 1920, as amended, directing the use and operation of the Reserve for its protection, conservation, maintenance and testing . . . .

Under the contract and authorizing statute, oil may be produced from the Reserve only when such production is necessary to protect, conserve, maintain and test the Reserve. Standard is entitled to receive sufficient oil to cover its "current expenses" of accomplishing those objectives. An essential element of those "current expenses" is the cost of lifting the oil out of the ground, *i.e.*, of producing it. Accordingly, Standard's lifting costs are "current expenses of protecting, conserving, testing and maintaining the Reserve."

The legislative history of the 1944 authorizing act confirms this conclusion. During his appearance before the Senate Committee on Naval Affairs, Representative Carl Vinson, Chairman of the House Naval Affairs Committee, asked his assistant, Mr. Cook, to clarify certain provisions of the bill that eventually became Public Law No. 78–343. Mr. Cook stated:

[A] private party to a unit contract will, in any event, be entitled to have produced from the reserve an amount of oil which will enable that private party to

meet his current expenses which are incurred in connection with the reserve.

In other words, when he puts his lands under the control of the Navy in the unit contract, if he were not permitted to receive enough oil from the reserve in order to pay his expenses, he would not only be putting his lands under the control of the Government, but he would be throwing in something more, namely, that amount of cash which he would have to pay over a period of time in order to pay the expenses.

*Hearings on S. 1772 (H.R. 4771) Before the Senate Committee on Naval Affairs*, 78th Cong., 2d Sess. 15 (1944) (statement of Representative Vinson); *see also* 90 Cong.Rec. 5285, 5286, 5288, 5291 (1944) (statement of Representative Vinson).

Mr. F. S. Bryant, a vice president and director of Standard, testified that the Unit Plan Contract, which the bill authorized, would entitle Standard "to sufficient production to be allocated to [its] use and charged against [its] share of the reserve to meet" "its expenses in maintaining its share of the field operations, testing, and other incidentals of operation including taxes." *Hearings on S. 1773 (H.R. 4771), supra*, 59. Alluding to the statement by Mr. Bryant, the Senate Committee Report noted that Standard agreed to the unit plan only upon the "assurance of production necessary to meet its expenses ... in connection with the exploration, operation, and conservation of this reserve." S.Rep.No.948, 78th Cong., 2d Sess. 4–5 (1944). The report stated that "[t]he committee endorsee [sic] these principles." *Id.*

One of the expenses Standard "incurred in connection with the Reserve" was its cost of lifting its oil out of the ground. The draftsmen of the Unit Plan Contract understood and intended that Standard would receive sufficient oil to meet all of those expenses.

The government points to other statements made to Congress that allegedly reflect a contrary view. For example, it quotes a statement attributed to Mr. Bryant in 1946 testimony before the House

Naval Affairs Committee (made approximately two years after the act was passed) that after the primary period Standard was to "pay the costs incident to receiving the amount of oil it will be entitled to produce to cover its share" of "current expenses" and taxes.

This quotation and others like it are irrelevant to the issue before us. Standard acknowledges that the Unit Plan Contract requires it to pay all of its operating expenses, including its "lifting costs." The question is whether section 5(f) entitles Standard to receive an amount of its own oil in the Reserve that covers the "out-of-pocket" "lifting costs" that it concededly must pay. The statements the government cites do not address that question.

■ The government also relies upon a change in the language of the Unit Plan Contract that was made while the contract was before the Congress. Under the preliminary Unit Plan Contract, section 5(f) entitled Standard to a quantity of oil equal in·value to the taxes associated with the Reserve plus "Standard's share of the current costs of maintaining, protecting and operating the Reserve." The Unit Plan Contract substituted the words "conserving" and "testing" for "operating." The government argues that by eliminating "operating" the parties intended to preclude Standard from obtaining "lifting costs," which result from "operating" the Reserve.

There is nothing in the contract or its negotiation or purpose indicating that this change in language was made for that reason. It is more likely that the language in section 5(f) was changed so that it would track the language in the authorizing statute. It is not surprising that the statute would not refer to "operating" the Reserve, since Congress wanted to make clear that the Act did not authorize operation of the Reserve for any purpose other than "protecting, conserving, testing and maintaining" it. In any event, the change in language is not sufficient to overcome the other indications that section 5(f) covers Standard's lifting costs.

## IV. THE DEFENDANT'S MOTION TO SUPPLEMENT THE RECORD

█ In March 1982, more than three-and-one-half months after oral argument in this case, the defendant filed a motion for leave to supplement the record. The defendant seeks to submit documents located among President Roosevelt's papers at the Franklin D. Roosevelt Library in Hyde Park, New York. For the most part, these documents are correspondence and memoranda concerning the Unit Plan Contract that were circulated within the executive branch of the federal government. For example, there, are several letters and memoranda from the Secretary of the Navy to the President.

The defendant gives no convincing explanation for this belated attempt to augment the record. Standard filed its petition in this case in April 1977, and its motion for summary judgment on counts I, II, and III in November 1980. On the same day, the defendant filed its motion for summary judgment on count I. In March 1981, the defendant filed its lengthy response to Standard's motion. If the material from the Roosevelt Library was relevant to this case, the defendant had ample opportunity to discover, obtain, and submit it prior to oral argument. In the exercise of due diligence it could and should have done so.

In any event, the material is of little relevance and is repetitive of evidence already before us in the stipulated documents. The material relates exclusively to the exchange of views within the executive branch of the government. Since Standard did not participate in those exchanges, the views there expressed concerning the meaning of the Unit Plan Contract do not bind Standard. "The unexpressed, subjective unilateral intent of one party is insufficient to bind the other contracting party, especially when the latter reasonably believes otherwise." *Firestone Tire & Rubber Co. v. United States*, 195 Ct.Cl. 21, 30, 444 F.2d 547, 551 (1971).

We therefore shall deny the defendant's motion to supplement the record.

## CONCLUSION

The plaintiff's motion for summary judgment on counts I and II of the petition is granted. The defendant's motion for summary judgment on count I is denied. This portion of the case is remanded to the Trial Division for a determination of damages on counts I and II and for further proceedings on count IV of the petition. The defendant's motion for leave to supplement the record is denied.