**UNITED STATES of America**

v.

**EXCELLAIR, INC., Omnet International, Inc., U.S. Accessories, Inc., International Technology Resources, Inc., Nicholas Kondur and Jonathan Moore.**

**and**

**INTERNATIONAL TECHNOLOGY RE-SOURCES, INC., a Colorado corporation, and Nicholas Kondur, Third Party Plaintiffs,**

v.

**FIRST INTERSTATE BANK OF RIVERTON, N.A., a National Banking Association and William V. Maddux, Third Party Defendants.**

Civ. A. No. 84–K–1055.

United States District Court,
D. Colorado.

May 29, 1986.

1380

**1382**

Janis E. Chapman, Asst. U.S. Atty., Denver, Colo., J. Christopher Kohn, Tracy J. Witaker, and Ronald H. Clark, Civil Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff.

Donald E. Marturano, Marturano and Baren, P.C., Englewood, Colo., for Omnet, Excellair and Jonathon Moore.

A. Thomas Tenenbaum, and John F. Reha, Brenman Raskin Friedlob & Tenenbaum, P.C., Denver, Colo., for ITR Airlines and Nicholas Kondur.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

In three transactions defendant Excellair borrowed over $10,000,000.00 to finance the purchase of equipment necessary to its business as a commuter airlines. The United States, through the Federal Aviation Administration, guaranteed these loans. Upon Excellair's default, the government honored its guarantees and accepted from the lenders assignment of the loans. The government accelerated the loans and, upon Excellair's failure to pay the amounts owed, seized much of Excellair's assets. The government has sold a substantial portion of this dispossessed collateral for an amount substantially less than the outstanding indebtedness. Jurisdiction and venue under 28 U.S.C. §§ 1345 and 1391(b), respectively, are not contested.

■ In its First Amended Complaint the government joins numerous defendants in addition to Excellair and premises its right to recovery on a variety of legal theories. Count One seeks to recover from Excellair $10,738,308.88 the government paid to the lenders pursuant to its loan guaranties.[1] Count Two is an action on the same debt but joins Omnet International, Inc. and U.S. Accessories, Inc., alleged mere instrumentalities of Excellair, as defendants. Count Three asserts a claim for conversion against Excellair, Omnet and International Technology Resources, Inc, a rival commuter airline. The government alleges that following default, acceleration and non-payment the government was unable to take possession of the collateral securing the loan because a substantial portion of it was concealed and transferred to ITR. Count Four premises recovery from ITR, Excellair and Omnet on a fraudulent conveyance theory. The government asserts that assets were transferred from Excellair and Omnet to ITR with the intent to hinder, delay and defraud creditors, including the government. Count Five asserts a claim for civil conspiracy against ITR, Nicholas Kondur (ITR's president and principal shareholder) and Jonathon Moore (Excellair's president and principal shareholder). This count contends that to enhance the profitability of ITR's commuter airlines division, Kondur, through ITR, and Moore conspired to force the cessation of Excellair's business, in violation of Colorado's anti-trust provisions, Colo.Rev.Stat. § 6-4-101 et seq. (1973). These defendants' conspiracy, the government contends, directly resulted in Excellair's inability to pay the FAA guaranteed loans to the detriment of the government. Count VI states that ITR, Kondur, and Moore's conduct constituted tortious interference with the contractual relations between Excellair, its lenders, and the government. Count VII contends that Moore, solely, is liable to the United States under 31 U.S.C. § 3713 for an $800,000.00 preferential transfer.

■ This case is now before me on a multitude of summary judgment motions which seek to eliminate all or a portion of the government's claims[2]. I will also ad-

---

1. The government has seized substantial portions of Excellair's assets. As such, in the Action on Debt as set forth in Count I, the most the government may recover is a deficiency judgment—the difference between the sale proceeds of the collateral seized and the amounts paid to the lenders pursuant to the guaranties.

2. These motions all seek summary judgment or dismissals for failure to state claims. Since all of the motions for dismissal incorporate documents extrinsic to the pleadings submitted in support of the summary judgment motions, all motions now before me will be treated as ones for summary judgment. Fed.R.Civ.P. 12(b)(6);

dress, after plodding through a procedural morass, a number of motions concerning the imposition of Fed.R.Civ.P. 11 sanctions. These motions will be considered in seriatim.

## I. SUMMARY JUDGMENT MOTIONS

### A. STANDARDS OF DECISION

Summary judgment pursuant to Fed.R. Civ.P. 56 is a drastic remedy which is appropriate only where no genuine issue of material fact exists and, as a matter of law, the movant is entitled to judgment beyond all reasonable doubt. In order to determine the propriety of summary judgment I must construe all pleadings, affidavits, and depositions liberaly in favor of the nonmovant. Where different inferences can be drawn from conflicting affidavits, judgments and pleadings, summary judgment should not be granted. *United States, etc. v. Santa Fe Engineers, Inc.,* 515 F.Supp. 512, 514 (D.Colo.1981).

### B. ALL COUNTS

#### 1. *Election by Estoppel*

■ In May of 1984 the government repossessed from Excellair four aircraft, eight engines and various spare parts. On July 17, 1984 an involuntary bankruptcy proceeding was instituted against Excellair, catalyzing the bankruptcy code's automatic stay provision, § 362, which prohibited the disposition of the seized collateral. In August of 1984 the aircraft and engines were appraised on behalf of the government at a value in excess of $4,000,000.00. On November 27, 1984 the bankruptcy proceeding was dismissed and the stay, accordingly, extinguished. In May of 1985, the government sold four engines and two aircraft, which had been valued the previous August at $1,100,000.00, for $549,000.00. C.R.S. § 4–9–505(2) provides that a secured creditor in possession of repossessed collateral may opt to retain the collateral in satisfaction of the underlying obligation. C.R.S. § 4–9–504(3) provides that "[d]isposition of ... (repossessed) ... collateral

*Donovan v. Gingerbread House, Inc.,* 536 F.Supp. 627 (D.Colo.1982).

may be ... at any time and place and on any terms, but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable".

Defendants[3] assert that the government's failure to dispose of the collateral in a commercially reasonable fashion pursuant to C.R.S. § 4–9–504(3) constitutes an election by estoppel to retain the collateral in satisfaction of the obligation pursuant to C.R.S. § 4–9–505(2). This argument is unavailing.

While in certain circumstances a secured party's failure to dispose reasonably of repossessed collateral may operate as an election to retain the collateral in full satisfaction of the debt, the instant case does not present such a circumstance. I need not address defendants' election by estoppel argument because defendants have not proven as a matter of law, the government's partial disposition and continued retention of the remainder of the collateral is commercially unreasonable. C.R.S. § 4–9–507(2) states

> The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not in itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold, he has sold in a commercially reasonable manner ...

C.R.S. § 4–9–504(3) requires consideration of "every aspect of the disposition including the method, manner, time, place and terms ..." It is beyond cavil that

> [I]t is the aggregate of circumstances in each case—rather than specific details of the sale taken in isolation—that should

3. The defendants joining the motion for summary judgment on this issue are ITR, Kondur, Excellair, Moore, U.S. Accessories and Omnet.

be emphasized in review of the sale. The facts of the manner, method, time, place and terms cited by the (Uniform Commercial) Code (as adopted by C.R.S. § 4–9–504(3)) are to be viewed as necessary and interrelated parts of the whole transaction.

*C.I.T. Corp. v. Lee Pontiac, Inc.,* 513 F.2d 207, 210 (9th Cir.1975) (paranthetical phrase added); *see also In re Zsa Zsa Ltd,* 352 F.Supp. 665 (S.D.N.Y.1972), *aff'd* 475 F.2d 1393 (2nd Cir.1973) and *Oliner v. Slavik,* 475 F.2d 1393 (2nd Cir.1973).

Defendants premise their argument upon the government's alleged untimeliness and the inadequacy of the price received, but they urge consideration in a vacuum. Nowhere do defendants address market conditions at the time of the sale, the method of sale, or reasonable and normal practices in the airline industry with respect to the purchase and sale of used aircraft and engines.

▆▆▆ A sale price less than the market value, or the appraised value, is not dispositive of commercial unreasonableness. C.R.S. § 4–9–507(2). A sale price less than the debtor expected does not require a finding of commercial unreasonableness. *Credit Alliance Corp. v. Cornelius and Rush Coal Co., Inc.,* 508 F.Supp. 63 (D.Ala. 1980). As well, the fact that a different price might have been obtained at a different time does not establish commercial unreasonableness. *C.I.T. Corp. v. Duncan Grading and Const., Inc.,* 739 F.2d 359 (8th Cir.1984); *Fedders Corp. v. Taylor,* 473 F.Supp. 961 (D.Minn.1979).

Accordingly, defendants' motion for summary judgment on all claims with respect to the reasonableness of the government's disposition of the collateral is denied.

*2. Equitable Estoppel*

▆▆▆ With respect to all claims set forth by the government, defendants ITR and Kondur contend the government is estopped from asserting the transfer of assets from Excellair to ITR was fraudulent because the government has acknowledged that ITR was a bona fide secured creditor of Excellair.

On April 18, 1985 the government and Excellair entered into a settlement agreement concerning Excellair's $2,250,000.00 tort claim against the government for a federal air traffic controller's negligence in causing a mid-air collision. The agreement provided the proceeds of the settlement were to be paid to ITR, because they collateralized April and May, 1984 loans upon which Excellair had defaulted. Defendants assert the agreement's recital that the settlement proceeds were to go to ITR constitutes the government's recognition of ITR as a bona fide secured creditor of Excellair. On May 16, 1985 the government filed its amended complaint joining ITR and Kondur as parties. The government contends the May, 1984 loan transaction between ITR and Excellair was a ruse designed to eliminate Excellair from the commuter airline competition and allow ITR to take over Excellair's operations without assuming liability for any of its indebtedness.

In *Armstrong v. United States,* 516 F.Supp. 1252, 1255 (D.Colo.1981), I stated:

> The elements of estoppel are succinctly delineated in *United States v. Ruby Co.,* 588 F.2d [697] at 703 (9th Cir.1978) as:
>
> 1) The party to be estopped must know the facts;
>
> 2) He must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it was so intended;
>
> 3) The latter must be ignorant of the true facts; and
>
> 4) He must rely on the former's conduct to his injury ...
>
> [t]he elements must also be read as requiring an affirmative misrepresentation or affirmative concealment of a material fact by the government.

All of these elements primarily concern the parties' mental states. As I've held "[s]ubjective questions of knowledge, state of mind and intent are not appropriate for summary disposition". *Runyan v. United Brotherhood of Carpenters,* 566 F.Supp. 600, 607 (D.Colo.1983); *see also,* C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure,* § 2730 (1973).

Accordingly, defendant's motion for summary judgment on all the government's claims under the doctrine of equitable estoppel is denied.

### 3. Laches

In resisting the July, 1984 bankruptcy petition, the government took the position in a November 8, 1984 hearing that all of Excellair's assets had been turned over to creditors holding valid security interests, including ITR. This hearing resulted in the dismissal of the bankruptcy and, according to defendants, partially provided the government with the informational basis of its claims against ITR and Kondur. The complete factual foundation of these claims was not known until defendants produced documents in response to a government subpoena in March, 1985. The amended complaint, joining ITR and Kondur was not filed until May, 1985. In the interim, the tort settlement—allegedly recognizing ITR as a bona fide secured creditor—was executed. It is this intervening tort settlement in which Excellair accepted $750,000 to waive its tort claim, defendants argue, which renders the two month delay between obtaining knowledge of the causes of action and filing the complaint unreasonable. Defendants ITR and Kondur contend the governments desire to obtain a favorable tort settlement was the reason for the delay in filing the amended complaint.

Laches is an equitable doctrine which may be applied to deny relief to a party whose "unconscionable delay in enforcing his rights has prejudiced the party against whom the claim is asserted". *Colorado Ground Water Commission v. Dreiling*, 198 Colo. 560, 606 P.2d 836, 838 (1979). In order to sustain a laches defense, defendants must prove

> (1) full knowledge of the facts; (2) unreasonable delay in the assertion of an available remedy; and (3) intervening reliance by prejudice to another.

*Herald Company v. Seawell*, 472 F.2d 1081, 1099 (10th Cir.1972); *see also, Tosco Corp. v. Hodel*, 611 F.Supp. 1130 (D.Colo. 1985).

In determining the applicability of a laches defense, I can not mechanically apply objective criteria, but rather must consider the equitable considerations which inform the laches doctrine. It has been noted that "the doctrine of laches ... recognizes the need for speedy vindication or enforcement of rights, so that courts may arrive at *safe conclusions as to the truth*". *Brundage v. U.S.*, 504 F.2d 1382, 205 Ct.Cl. 502 (1974); *cert. denied*, 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975) (emphasis added). This circuit has stated that,

> [t]he essential question to be determined is whether the assertion of the plaintiff's cause has, through the lapse of time considered with the circumstances and nature of the alleged cause, become unconscionable and, if allowed to prevail, would constitute an injustice to defendants.

*Hunt v. Pick*, 240 F.2d 782, 785 (10th Cir. 1957). It is also generally accepted that, being an equitable defense, "laches ... ordinarily is not applied to actions at law, where the statute of limitations governs the time limit of filing suit." *Standard Oil Co. of California v. United States*, 685 F.2d 1322, 1333, 231 Ct.Cl. 86 (1982).

Further, as I held in *Gilford v. United States*, 573 F.Supp. 96, 98 (D.Colo.1983), "[m]ere delay in filing an action at law will rarely implicate the equitable defenses of laches, absent bad faith or intentional and unreasonable procrastination." (Citations omitted.)

With these considerations in mind, I can not find, as a matter of law, that laches bars this suit.

The intent of the government in delaying the amendment of its complaint is a genuine issue of material fact precluding summary judgment. Assistant United States Attorney Schlumberger states in affidavit that he was unaware of the tort settlement when the amended complaint was filed. Taking the evidentiary matter of the nonmovant to be true, then, the failure to file the amended complaint sooner could not have been a result of the government's waiting until after the tort claim had been

settled. Such being the case, I cannot find that the delay in joining ITR and Kondur was unreasonable.

Defendants also fail to support by affidavit or otherwise their allegations of reliance upon the tort settlement and the government's conduct in the bankruptcy. Bare pleadings, without support are insufficient to sustain a summary judgment movant's arduous burden. *See, Banks v. St. Mary's Hospital and Medical Center,* 558 F.Supp. 1334, 1338 (D.Colo.1983).

Defendants' motion for summary judgment is defective in a number of additional ways which I need not discuss. The motion for summary judgment on all of the government's claims under the doctrine of laches is denied.

## C. COUNT II—ACTION ON DEBT

### 1. Accessories—Mere Instrumentality

In Count II the government hopes to hold U.S. Accessories, Inc. liable for the defalcations of Excellair on the ground that Accessories is an entity indistinct from Excellair. Defendant Accessories moves for summary judgment that, as a matter of law, it was not a mere instrumentality of Excellair during its short existence [4] and, therefore, is not liable for Excellair's debts.

The Colorado Court of Appeals has recently held that

> Before one corporation may be held liable for the acts of another corporation, there must be such a close relationship between the two companies that one is, in essence, an instrumentality of the other.

*New Sheridan Hotel & Bar, Ltd. v. Commercial Leasing Corp., Inc.,* 645 P.2d 868, 869 (Colo.App.1982).

> The control necessary to invoke what is called the "instrumentality rule" is not mere majority or complete stock control, but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will, or existence of its own and is but a business conduit for its principal.

1 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* § 43 at 204–05 (re. perm. ed. 1963).

In *Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373, 1378 n. 4 (10th Cir.1980), this Circuit re-iterated the *Fish v. East,* 114 F.2d 177, 191 (10th Cir.1940) factors to be considered in determining whether one corporation is a mere instrumentality of another:

> (1) The parent owns all the stock; (2) both have common directors and officers; (3) the parent finances the subsidiary; (4) the parent causes the subsidiary's incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent pays salaries or expenses of the subsidiary; (7) the subsidiary has no business except with its parent or subsidiary corporation or no assets except those transferred by its parent or subsidiary; (8) directors and officers do not act independently in the interests of the subsidiary; (9) formal legal requirements of the subsidiary such as keeping corporate minutes are not observed; (10) distinctions between the parent and subsidiary and its subsidiary are disregarded or confused; (11) subsidiaries do not have full board of directors.

The affidavit of defendant Moore establishes the existence of a number of these factors, including 1) partial overlap in directors, Mr. and Mrs. Moore, between the two companies; 2) Excellair's causing Accessories incorporation and dissolution; 3) Accessories failure to obtain capital or assets other than that provided by Excellair; 4) Accessories sole business activity being

---

**4.** Accessories was incorporated on September 7, 1982 and dissolved on January 5, 1985. It existed during all times pertinent hereto. The reason for its incorporation was to allow the underworked Excellair aircraft mechanics to contract for work in addition to that done on Excellair's small fleet without liability for such ventures extending to Excellair. This purpose, according to Moore's affidavit was never realized, as Accessories limited its work to Excellair's planes. U.S. Accessories was dissolved as a result of Excellair's having to drop any reference to "U.S." from its or its subsidiaries' names when it changed its name from U.S. Aviation d/b/a Air U.S. to Excellair. The brief existence of Accessories does not insulate it from alter ego liability, if in fact, during its existence it was a mere instrumetality of Excellair.

with Excellair; 5) Excellair's having paid the salaries of Accessories employees; and 6) the non-observance of corporate formalities. In short, Moore's affidavit indisputably establishes that Excellair completely dominated all aspects of Accessories existence.

That the government has not set forth facts establishing, as a matter of law, Accessories' being a mere instrumentality of Excellair is not dispositive. The focus of my inquiry in this motion for summary judgment is whether defendant has established, as a matter of law, that it is not now nor ever has been Excellair's puppet. The burden resting on defendants has not been met. Accordingly, this portion of these motions for summary is denied.

*2. Omnet—Mere Instrumentality*

Omnet incorporates the arguments advanced by Accessories to move for summary judgment that it, too, is not an instrumentality of Excellair. For the reasons set forth above, this motion, too, is denied. Omnet has not set forth facts sufficient to establish as a matter of law, that it was not Excellair's instrumentality; A reasonable finder of fact could well find, on the facts now before me, that Omnet was not a distinct and separate corporate entity

### D. COUNT III—CONVERSION

■ Defendants [5] correctly assert in order to sustain a cause of action for conversion of Omnet's assets, the government must show an immediate right to possession of the allegedly converted assets. The Uniform Commercial Code, as embodied in the Colorado Revised Statutes, gives a secured party an immediate right to possession of a debtor's assets upon default if the secured party files a financing statement which sets forth the name of the owner of the assets. *See* C.R.S. §§ 4–9–301, 302, 303, 402(1) and 402(7). Defendants argue since Excellair and not Omnet is the debtor named on the financing statement, the government has no claim on any of Omnet's assets and, therefore, lacks standing to assert a conversion claim as to these assets.

The government does not contest that Omnet is not the named debtor on its financing statements. Rather, it asserts that Omnet should be held liable for conversion because Omnet is a mere instrumentality of Excellair. The government has asserted facts which support this contention: That Omnet was a conduit for purchasing and holding spare parts for Excellair's benefit; That Excellair and Omnet were under common or related ownership and control and had common employees, officers and directors; and, That Omnet and Excellair shared common office space.

■ Corporate separateness may be disregarded in cases where to do otherwise will defeat public convenience, justify wrong, protect fraud or defend crime. *See* 18 C.J.S. *Corporations* § 7(e) at 382; *New Sheridan Hotel & Bar, Ltd. v. Commercial Leasing Corp.*, 645 P.2d 868 (Colo. App.1982); *Bishop v. United States*, 16 F.2d 410, *as modified*, 19 F.2d 224 (8th Cir.1927).

In the instant case, assuming the allegations in the government's complaint to be true, recognizing the corporate separateness of Excellair and Omnet would protect a fraud upon the government as a creditor. Defendants' position is untenable: If in all cases a secured creditor's perfected security interest were limited to assets possessed by the party named on the financing statement, a debtor might defeat the creditor's security interest simply by transferring all its assets to a "dummy" corporation. Needless to say, equity does will not tolerate perpetration of fraud in the name of obeisance to the UCC's filing statement provisions.

Accordingly, defendant's motion for summary judgment on Count III of the government's complaint for conversion as to Omnet is denied.

### E. COUNT IV—FRAUDULENT CONVEYANCE

*1. Contemporaneous Giving of Value*

■ Defendants Excellair, Moore and Omnet assert the government's fraudulent

---

**5.** ITR, Kondur, Excellair, Moore and Omnet.

conveyence claim is not supported by the facts of this case and should be dismissed as a matter of law. Without citing authority, defendants claim the pledge of assets contemporaneous with the giving of value (the loan) is not a fraudulent conveyance. While I'm cognizant of the applicability of this rule of law in certain situations, the instant case does not present such a circumstance.

In *Fish v. East*, 114 F.2d 177, 183 (10th Cir.1940), the 10th Circuit construed Colorado fraudulent conveyance law to hold that "intent may be inferred from the facts and circumstances surrounding the conveyance". The government has proffered compelling "facts and circumstances" inferring fraud; It would be inappropriate for me to find, as a matter of law, ITR's May, 1984 acquisition of many of Excellair's assets [6] was not a fraudulent conveyance.

The government has alleged several indicia of fraud: Excellair's insolvency at the time of the conveyence; consideration below the value of the property conveyed; the inclusion of Moore as a member of the board of director's of ITR; the transfer to Cydelle Moore, wife of defendant Moore, of 15% of the stock of ITR; and, the hiring by Frontier Commuter, ITR's commuter airlines division, of 75 former Excellair employees. Amended Complaint, ¶ 33. Defendants assert documents exist which controvert these indicia of fraud. No such documents, however, have been brought to my attention. Because summary judgment is such a drastic remedy, I must accept the allegations in the non-movant's pleadings as true.

That ITR had given value to Excellair in exchange for the pledge of assets eventually taken over by ITR is of no import. The crux of the government's fraudulent conveyence theory is that the value given was part of a ruse whereby Excellair was eliminated from competition, ITR got a substantial portion of Excellair's assets with none of its liabilities, and the government was left with repossessed collateral insufficient to cover the amount expended in performance of the guaranties. The "giving of value" should not be viewed in a vacuum, but rather in light of the facts and circumstances of the conveyence. In this instance it is not a preclusion to a fraudulent conveyance claim. The intent and motive of the defendants in performing these acts is best reserved for the trier of fact.

*2. Blanket Security Interest*

Defendants also seem to argue that the failure of the government's security interest to cover *all* of Excellair's assets precludes a fraudulent conveyance claim with respect to those assets. This is erroneous. A creditor need not be secured in order to assert a fraudulent conveyance claim. *See* 37 Am Jur 2d, *Fraudulent Conveyances*, §§ 132 *et seq.* A conveyance may defraud a creditor of his interest in the debtor's assets notwithstanding the imperfection or narrow scope of that interest. To deny such a creditor redress would be to ignore the validity of that interest. The purpose of UCC's "perfected security interest" concept has never been to deny a creditor whose interest was not perfected protection of that interest.

Accordingly, defendants' motion for summary judgment on the government's fraudulent conveyance claim is denied.

## F. COUNT V—CIVIL CONSPIRACY

Defendants ITR, Kondur, Excellair and Moore argue the government has failed to assert a cognizable claim for civil conspiracy.[7] In *Lockwood Grader Corp. v.*

---

6. The government asserts that ITR obtained a substantial portion of "Excellair's personal property ... all of Excellair's cash, accounts, accounts receivable, all inventory and supplies, all furniture, fixtures, and the goodwill, name, all contract or leasehold rights, choses in action, Air Carrier Operating Certificate No. 2RM-67, an aircraft hangar in Sheridan, Wyoming, and all general intangibles of Excellair." Amended Complaint, § 27. See "Rule 11 Motions" in text.

7. Defendants' argument that the government as creditor has no standing to assert a claim under Colorado's anti-trust statute is well taken but irrelevant. Count V of the amended complaint is grounded in common law civil conspiracy which, as discussed more fully in the text of this opinion, provides a remedy for conspirators' unlawful acts causing plaintiff injury. Civil conspiracy does not require that the requisite "unlawful act" component of a civil conspiracy claim itself afford plaintiff a remedy. If the

*Bockhaus,* 129 Colo. 339, 345–46, 270 P.2d 193 (1954) the elements of common law civil conspiracy are enunciated:

> To constitute a civil conspiracy there must be: (1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof.

*See also, McGlasson v. Barger,* 163 Colo. 438, 431 P.2d 778, 780 (Colo.1967); *Rodriguez v. Bar S Foods,* 539 F.Supp. 710, 718–19 (D.Colo.1982).

### 1. Causation

 Defendants assert, as a matter of law, that their alleged conspiratorial conduct was not the proximate cause of the government's injuries. "[I]f damages do not arise as a direct result of the conspiratorial acts", defendants contend, "and the injury claimed is remote, contingent and indefinite,. no cause of action lies". *Martinez v. Hernandez,* 330 F.Supp. 856, 858 (D.P.R.1971).

I do not agree, as a matter of law, that the government's injuries are too remote, contingent or indefinite to support a claim for civil conspiracy. To begin with, "if the evidence is in dispute, or if reasonable men may well differ as to the inferences to be drawn from undisputed facts, the issue[s] of ... proximate cause are questions of fact to be resolved by the trier of fact." *Kinsella v. Leonard,* 415 F.2d 574, 576 (10th Cir.1969); *see also, Banks v. Chicago Grain Trimmers Ass'n,* 390 U.S. 459, 88 S.Ct. 1140, 20 L.Ed.2d 30 (1968), *reh'g denied* 391 U.S. 929, 88 S.Ct. 1800, 20 L.Ed.2d 671 (1968).

Questions of fact, better reserved for the finder of fact, exist as to whether the alleged conspirators' activity caused the default resulting in the government's loss or whether the loss was caused by defaults occurring before defendants' activity.

 Defendants consider only selective portions of the government's amended complaint to state that no claim for civil con-

spiracy has been pleaded. Citing § 34 of the amended complaint, defendants allege that the government only pleads that the direct result of the conspiracy was to drive Excellair out of business. Excellair's failure to generate revenue to repay the FAA guaranteed loans and the government's assumption of the loans was never, defendants argue, pleaded as a direct result, but only as an indirect result. Accordingly, defendant's argument goes, an element of civil conspiracy—direct loss—has not been pleaded. This argument is severly flawed. Defendants mischaracterize the government's conspiracy theory.

The extent of the government's conspiracy is that ITR originally sought to eliminate Excellair through corporate acquisition. Excellair's indebtedness, however, rendered legal acquisition of it prohibitive. Instead, through a series of fraudulent transfers involving ITR, Kondur and Moore, (a loan and taking a security interest in assets followed shortly by default and possession of the secured assets), ITR acquired much of the assets of Excellair without becoming responsible for its indebtedness. Under the government's conspiracy theory, as pleaded in its complaint and set forth in its briefs on the instant motions, the injury suffered by the government, inability to reach Excellair's assets to satisfy debts owed it, was a result calculated by the conspirators. The government has sufficiently set forth facts which support the causation element of a civil conspiracy claim.

Defendants cite *Robitaille v. Morse,* 283 Mass. 27, 186 N.E. 78 (1933), for the proposition that to be actionable, the conspiracy must be directed at the plaintiff for the primary purpose of causing him injury. The applicability of this Massachusetts civil conspiracy principle to Colorado law is fanciful. Suffice it to say that causing the government injury by fraudulently removing assets from the scope of the government's security interest or in derogation of the government's right to attach unsecured

unlawful act provided a remedy, there would be no need for the civil conspiracy theory.

assets to satisfy amounts owed it was a primary purpose of the conspiracy.

That the injury to the government is not too attenuated from the defendants' conduct to preclude a summary dismissal of the civil conspiracy claim is clear in light of *Pullen v. Headberg,* 53 Colo. 502, 506, 127 P. 954 (1912). In *Pullen,* two employees of a corporation conspired to defeat plaintiff's levy of stock owned by a shareholder by certifying to the levying officer that the shareholder owned no such stock. The shareholder was thus allowed to escape payment to plaintiff. The Colorado Supreme Court found causation between the conspirator's activity and the plaintiff's injuries, holding that "[w]hen a creditor has acquired a lien on his debtor's property, then a conspiracy which defeats the lien is actionable...".

## 2. Conspiracy to Conspire

█ Defendants argue the gist of Colorado's restraint of trade statutes, C.R.S. § 6–4–101 *et seq.* (1973), is a prohibition of conspiring to restrain trade. They attempt to defeat the government's claim for civil conspiracy as set forth in Count V by contending "a conspiracy to commit a conspiracy" is not actionable.

This argument is unpersuasive. Defendants have cited no authority for the proposition that a civil conspiracy to conspire criminally, where the criminal conspiracy is a substantive statutory offense, is not actionable. The general prohibition against a conspiracy to commit a conspiracy in the criminal context does not apply. In the purely criminal context, a conspiracy to conspire is generally not actionable because the "first" conspiracy's "overt act" requirement is necessarily not satisfied. If these elements were satisfied then the conduct would rightfully be characterized as a conspiracy to commit the substantive crime itself: There would be no need to allege the "second" conspiracy. In the present context, however, the conspiracy to restrain trade is the substantive offense. C.R.S. § 6–4–101 states "[e]very contract or combination in the nature of a trust or *conspiracy in the restraint of trade or commerce is declared illegal.*" Hence, the conspir-

acy to restrain trade in this case is the overt act in furtherance of the crime; the conspiracy is the crime itself. The elements of the "first" conspiracy have been satisfied. This being the case, there is no reason why the government's fifth claim for relief should be dismissed.

As well, I don't agree with defendants that the sole substance of Colorado's restraint of trade and commerce provisions is conspiracy. The statute prohibits any "combination, conspiracy, trust, pool, agreement, or contract" which restrains trade. In this light, defendants' "conspiracy to conspire" defense is unavailing because the government's claim may well be characterized as a conspiracy to engage in conduct calculated to restrain trade which doesn't amount to a conspiracy.

No matter the analysis, defendants' conspiracy to conspire theory is untenable.

## 3. Pre-emption

█ Defendants take one line of obiter dicta, "[s]tate anti-trust legislation serves the important function of protecting the public against illegal trade restraints beyond the reach of federal law", *People v. North Ave. Furniture & Appliance, Inc.,* 645 P.2d 1291 (Colo.1982), to support their contention that Colorado's anti-trust statutes, C.R.S. § 6–4–101 *et seq.* are pre-empted by federal anti-trust legislation. Defendants argue that § 6–4–101 *et seq.* only regulates intrastate commerce so their interstate activity is without the ambit of the act. This is erroneous.

Whether Colorado's anti-trust statutes are pre-empted by federal legislation is an issue of first impression. However, cases considering the pre-emptive effect of federal legislation on similar state statutes have uniformly held those statutes not pre-empted:

Combinations which interfere with interstate commerce are within federal control ... But the federal anti-trust laws do not pre-empt state jurisdiction over the intrastate aspects of the combination.

54 Am.Jur.2d, *Monopolies,* § 461. *See also, Matthews Conveyor v. Palmer-Bee Co.,* 135 F.2d 73, 82 (6th Cir.1943):

It may further be observed that while Congress has the power to legislate with regard to interstate commerce, declaring certain contracts illegal if they tend to lessen competition, the states are not thereby pre-empted of the right to legislate as to matters of public policy with reference to contracts in restraint of trade. This right they have under their inherent police powers, and such statutes as are enacted thereunder, are to be presumed to be constitutional in default of a showing to the contrary, or unless, on their face, they are arbitrary and unreasonable.

Accordingly, defendants' motion for a summary judgment on the government's civil conspiracy claim, Count V, is denied.

## G. COUNT VI—TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

Count VI of the government's amended complaint is directed against ITR, Kondur and Moore and premises a right to recovery upon defendants' alleged tortious interference with contractual loan transactions between Excellair and its lenders which were guaranteed by the government. Defendants make several arguments in an attempt to have this claim dismissed.[8]

### 1. Conduct Inducing Breach

A *prima facie* element of tortious interference with contractual relations is that the defendant's conduct caused or induced non-performance of the contract.[9] Defendants argue that Excellair had breached the loan agreements guaranteed by the government long before ITR and Kondur had entered the scene in April of 1984. Defendants assert as a matter of law they could not have induced the breach.

In support of this argument, defendants have submitted documentation purporting to "conclusively demonstrate" that they did not cause Excellair's breach. Exhibit E of defendants' brief is a copy of an "Agreement Among Creditors" of which the government, (FAA), was a signatory. The agreement manifests knowledge by the government that Excellair had defaulted on the guaranteed loans on October 31, 1982 and that adherence to the original terms of the loan agreements was also violated on January 31, 1983, April 30, 1983, July 31, 1983 and on October 31, 1983. Notwithstanding these breaches, the agreement among creditors provides for the modification of the terms and repayment dates of the original loan agreements. The lenders and the government had, in effect, waived Excellair's breaches under the original loan agreement; the result of the agreement among creditors, Exhibit E, was to preserve the viability of the loan contracts.

Exhibit F of defendants' brief includes the "Twelfth Amendment to the Agreement Among Creditors", dated January 12, 1984.[10] The amendment sets forth a postponement of "settlement dates" as called for in the agreement among creditors and subsequent amendments thereto. By executing this document the government and lenders had agreed to a modification of the

---

**8.** In addition to the defenses to the tortious interference with contract claim set forth in the text, defendants assert that since the conspiracy claim is not actionable neither should the tortious interference claim be sustained. I have ruled that the civil conspiracy claim is viable. Hence, defendants' defense on this basis is rejected.

**9.** As I have held in *Williams v. Burns,* 540 F.Supp. 1243, 1251 (D.Colo.1982), there are five specific elements of the tort of intentional interference with performance of a contract by a third person:

1) existence of a valid contract between plaintiff and a third party; 2) knowledge by the defendant of the contract or knowledge of

facts which should lead him to inquire as to the existence of the contract; 3) intent by the defendant to induce or cause the third party not to perform; 4) action by the defendant which induces or causes non-performance of the contract; and 5) resulting damage to the plaintiff. *See Comtrol Inc. v. Mountain States Tele. & Tel. Co.,* 32 Colo.App. 384, 513 P.2d 1082, 1084 (Colo.App. 1973).

**10.** Exhibit F. also includes a copy of an opinion letter from chief counsel of the FAA to one of the lenders. This letter constitutes the governments acknowledgment of the validity and enforceability of the Twelfth Amendment to the agreement among creditors.

agreement among creditors, which modified the original loan agreement.

Although defendants ostensibly attack the causation element of the government's tortious interference with contract claim, the gist of their argument appears to be that no valid contract existed at the time of ITR and Kondur's involvement.[11] In *Williams v. Burns*, 540 F.Supp. 1243, 1251 (D.Colo.1982), I granted defendant's motion for summary judgment on plaintiff's tortious interference with contract claim because the "plaintiff ha[d] failed to allege or present any evidence of an existing contract".

In the instant case, however, defendants' Exhibits E & F constitute effective waiver of Excellair's defaults and operate as a modification of the loan terms. The effect of these agreements was to preserve the loan agreements validity. Only its terms were changed. A contract existed at the time of ITR and Kondur's involvement. Defendants' argument that Excellair had been "continually" in default is unavailing. Any such defaults, in light of their being waived, failed to vitiate the agreement. At the time of defendants' alleged breach-inducing contact in May of 1984, a valid contract between the lenders and Excellair, with the government acting as guarantor, was in effect. It is the breach of the loan agreement, as modified, which defendant's conduct allegedly induced. The government has adequately set forth facts that defendants' May, 1984 involvement induced Excellair's breach at that time. ITR and Kondur's non-involvement in Excellair's

earlier defaults is not dispositive because these defaults were waived.

In support of this conclusion, Restatement (Second) of Torts, § 766, comment f (1979)[12], states that a defendant to a tortious interference with contract claim may not use as a defense any of the contracting parties' defenses to enforcement of the underlying contract. Even if a party to the contract may be in a position to avoid liability, "[t]he defendant actor is not, however, for that reason free to interfere with performance of the contract *before it is avoided*". § 766, comment (f).

While "comment (f)" contemplates a situation where the contracting party whom the breach was against could have "avoided" the contract, (i.e. justifiably fail to perform its end of the bargain), the logic is analogous to the present situation where the lenders had completely discharged their performance by making the loans. While the lenders could have treated Excellair's early failures to pay as breaches, accelerate the amounts owed and invoked the governments guarantee, they chose not to. Just as comment (f) disallows a defendant's invocation of an unused defense, I will not allow the instant defendants to invoke the lenders unused right earlier to hold Excellair to the terms of the original loan contract and enforce their appropriate breach remedies.

### 2. Intent

Defendants assert that the intent requisite of a tortious interference with contract claim has not been sufficiently pleaded.[13] The only intent alleged by the

---

11. See footnote number 8, supra.

12. Restatement (Second) of Torts, § 766, comment f, states that:

The word "contract" connotes a promise creating a duty recognized by law ... The particular agreement must be in force and effect at the time of the breach that the actor has caused; and if for any reason it is entirely void, there is no liability for causing its breach. Furthermore, it must be applicable to the particular performance that the third person has been induced or caused not to discharge. It is not, however, necessary that the contract be legally enforceable against the third person. A promise may be a valid and subsisting contract even though it is voidable

... The third person may have a defense against action on the contract that would permit him to avoid liability on it if he sees fit to do so. Until he does, the contract is a valid and subsisting relation, with which the actor is not permitted to interfere improperly. Thus, by reason of the statute of frauds, formal defects, lack of mutuality, infancy, unconscionable provisions, conditions precedent to the obligation or even uncertainty of particular terms, the third person may be in a position to avoid liability for any breach. The defendant actor is not, however, for that reason free to interfere with performance of the contract before it is avoided.

13. See footnote number 8.

government, defendants assert, was defendants' intent to eliminate Excellair as a competitor in the commuter airline industry. Non-payment of the government guaranteed loan, defendants argue, was merely an "indirect consequence of the alleged intentional act of eliminating competition". This is a disingenuous mischaracterization of the government's theories of relief. Considering the pleadings of the non-movant government in a light most favorable to it, the government is clearly alleging that defendants intended Excellair to default on its loans. Amended Complaint, §§ 37 and 38. At the very least, defendants knew to a certainty that their conduct would result in Excellair's breach on the loan contracts. From this, intent may be inferred.

■ The precise intent of defendants in giving Excellair a loan on May 7, 1984, collateralizing it with Excellair's assets, and demanding payment on May 11, 1985 is best reserved for the trier of fact. As I held in *Runyan v. United Brotherhood of Carpenters,* 566 F.Supp. 600, 607 (D.Colo. 1983), "[s]ubjective questions of knowledge, state of mind and intent are not appropriate for summary disposition". *See also* C. Wright & A. Miller, *Federal Practice and Procedure.* § 2730 (1983).

### 3. Waiver and Estoppel

■ Defendants Excellair and Moore assert that the government's having entered into the Agreement Among Creditors and subsequent amendments thereto constitute a waiver by the government of any breach claims arising from any previous default. This is correct. Defendants then argue that the government, therefore, is estopped from asserting that defendants tortiously interfered with contractual relations. This is incorrect.

Defendants only briefly raise this argument, without elaboration or recitation of authority. I understand why; this defense is non-sensical. It is impossible for the government to have waived (and now be estopped from asserting) claims which arose from conduct which had not yet occurred. At the time of the agreement among creditors and its amendments, de-

fendants' activity giving rise to the tortious contractual interference claim had not occurred. Defendants admit as much.

Accordingly, the government is not estopped from asserting claims based on Excellair defaults occurring after the latest amendment to the agreement among creditors.

### H. COUNT VII—MOORE'S PERSONAL LIABILITY FOR PREFERENTIAL TRANSFER

31 U.S.C. § 3713 provides that:

(a)(1) A claim of the United States Government shall be paid first when—

 (A) A person indebted to the government is insolvent, and—

\* \* \* \* \* \*

 (iii) an act of bankruptcy is committed.

In May of 1984 ITR transferred about $800,000.00 to Excellair in exchange for a security interest in certain of Excellair's assets. As noted above, shortly thereafter ITR demanded repayment, Excellair defaulted and ITR seized the collateral. (The so-called loan "ruse"). Count VII of the amended complaint concerns what Excellair did with that $800,000. The government alleges Excellair, at Moore's direction, transferred the money to First Interstate Bank of Riverton, Wyoming in payment of Excellair's overdrafts which had been honored by that bank. At the time of this payment, Excellair was insolvent. The payment to the bank, the government accordingly argues, was an act of bankruptcy—a preferential transfer. The money paid to the bank was allegedly rightfully owed to the government pursuant to 31 U.S.C. § 3713.

■ In Count VII the government seeks to hold Moore personally liable for the amount of the transfer to the bank pursuant to 31 U.S.C. § 3713(b) which states:

A representative of a person or an estate ... paying any part of a debt of a person or estate before paying a claim of the government is liable to the extent of the payment for unpaid claims of the Government.

Defendants Moore and Excellair move for a summary judgment in their favor on Count VII. Defendants assert that 31 U.S.C. § 3713 is not applicable because at the time of the allegedly fraudulent transfer, no moneys were due and owing the government. The government, defendants contend, had no claim against Excellair until the assumption of the loans, acceleration and default, all of which occurred after the $800,000 payment to the bank.[14]

### 1. A "Claim"

■ Defendants rely on *Massachusetts v. United States*, 333 U.S. 611, 627, 68 S.Ct. 747, 756, 92 L.Ed. 968, 979 (1940), where, in construing § 3713's predecessor, 31 U.S.C. § 191[15], the Supreme Court held that a debtor's unexercised right to elect to pay unemployment compensation tax to the state rather than the federal government did not render the "debt due" the federal government a mere contingency. However, the court held

> it is at least doubtful on the statute's wording that obligations wholly contingent for ultimate maturity and obligation upon the happening of events after insolvency can be said to fall within the reach of "debts due" as of the time of the insolvency.

*Id.*, 333 U.S. at 627, 68 S.Ct. at 756.

■ Defendants urge at the time of the transfer[16] the claim of the government was wholly contingent upon the government honoring its loan guaranties and is, therefore, outside of § 3713's ambit.

■ *United States v. Moore*, 423 U.S. 77, 83, 96 S.Ct. 310, 46 L.Ed.2d 219, 224 (1975) rejected the current defendants' argument that priority only be accorded "to those claims that are liquidated and certain in amount at the time an assignment for benefit of creditors is made". Rather, the court declined to construe the statute narrowly, denying that a "distinction be drawn for this purpose between liquidated and unliquidated debts". 96 S.Ct. at 314, 46 L.Ed.2d at 224–25. The *Moore* Court, however, though referring to the above-quoted language from *Massachusetts* as "dicta", inferentially bolstered its viability by distinguishing the facts before it from those in *Massachusetts*:

> Respondent Moore relies on dicta in *Massachusetts* ... to the effect that "obligations wholly contingent for ultimate maturity and obligation upon the happening of events after insolvency" are not "debts due". But the obligation here was fixed and independent of "events after insolvency"; only the precise amount of that obligation awaited future events.

*Moore*, 423 U.S. at 85, 96 S.Ct. at 315 (citations omitted).

The clear implication is that a debt whose very existence, and not just amount or becoming liquidated, was contingent upon post-insolvency events could very well be without the scope of § 3713.

*Moore & Massachusetts*, however, must be read in light of subsequently enacted

---

**14.** Defendants also contend that the non-occurrence of an assignment for the benefit of all general creditors precludes the government from asserting a claim under 31 U.S.C. § 3713. No authority is cited in support of this contention, and I know of none. Nothing in the statute indicates such an assignment is a requisite to its invocation. I dismiss this argument without further discussion.

**15.** In *Massachusetts* the court construed a provision of former section 191 which stated that "debts due the United States shall be first satisfied. The current section 3713(a) (Pub.L. 97–258, Sept. 13, 1982, 96 Stat. 972), substituted this sentence with "A claim of the United States shall be paid first". The explanatory notes to the newly enacted § 3713 state that "the word 'claim' is substituted for 'debts' for consistency.

The word 'due' is ommitted as unnecessary ... The word 'paid' is substituted for 'satisfied' for consistency."

Because the change in language between former § 191 and § 3713 at issue here was not intended to create substantive change in the effect of the "priority of government claims" statutory scheme, case law interpreting "debts due the United States" will be considered pertinent to a determination of whether Excellair's indebtedness is a "claim of the United States". Note, however, § 3701(b), discussed more fully in the text.

**16.** Whether the United States has a claim is considered as of the time of the transfer. *United States v. Moore*, 423 U.S. 77, 96 S.Ct. 310, 46 L.Ed.2d 219 (1975).

legislation. In anticipation of the present situation, Congress enacted 31 U.S.C. § 3701 [17], the definitional section for chapter 37:

> (b) In subchapter II of this chapter, "claim" includes amounts owing on account of loans insured or guaranteed by the government and other amounts due the government.

31 U.S.C. § 3701(b). Section 3713 is part of subchapter 2, making § 3701(b) applicable.

This definition, as far as electronic research can tell, has not previously been construed. The sole sensible interpretation is that a loan guaranteed by the government is a "claim of the United States" even when, at the time of transfer, the guarantee had not yet been honored. If the statute were construed so as to require the government to honor its guarantee before the defendants transfer, then the government would necessarily have a claim against the defendant per the plain meaning of § 3713 and the expansive reading given it by *Moore*. Section 3701(b) would be superfluous. It is beyond dispute that statutes must be construed so as to give each of its provisions distinct meaning. *Equal Employment Opportunity Commission v. Continental Oil Co.*, 548 F.2d 884 (10th Cir.1977). Section 3701(b) can have distinct meaning only if it covers a government guaranteed loan before the guaranty has been honored.

Accordingly, defendants motion for summary judgment on Count VII, Moore's personal liability under 31 U.S.C. § 3713, is denied.

## II. RULE 11 MOTIONS

### A. PROCEDURAL BACKGROUND

On June 13, 1985 defendants ITR and Kondur filed a motion for the imposition of sanctions pursuant to Fed.R.Civ.P. 11. On June 26, 1985, defendants Excellair and Moore filed a similar motion, as well as one seeking this judge, rather than a magistrate to consider their Rule 11 motion.[18] On July 3, 1985 the government filed a cross-motion for Rule 11 sanctions against ITR and Kondur. On July 10, 1985 the government filed a similar cross-motion against Excellair and Moore. On July 12, 1985 a hearing on ITR and Kondur's Rule 11 motion, the issues of which are substantially identical to Excellair and Moore's, was held before Magistrate Schauer. On August 28, 1985, defendants ITR and Kondur moved for a joint consideration of their Rule 11 and summary judgment/dismissal motions.[19] This motion was promptly granted. On February 21, 1986 Magistrate Schauer ruled on the sanctions motions, denying both groups of defendants' motions and deferring to rule on the government's cross-motions until after the end of this litigation. On March 13, 1986 defendants ITR and Kondur filed a motion for reconsideration of magistrate's order. On March 14, 1986 defendants Excellair and Moore filed a motion to vacate[20] magistrate's order.

---

17. Pub.L. 97–452, § 1(13)(A), 96 Stat. 2469 created this definition on January 12, 1983.

18. Defendants contend that their motion for sanctions was dispositive in nature pursuant to Local Rule 602(A), and, therefore, unreferrable to a magistrate. This motion was not ruled upon. Court records and Magistrate Schauer's February 21, 1986 order indicate, however, that defendants' Rule 11 motion was referred to the magistrate. Any expectation that my declining to rule on the motion constitutes its being granted is unwarranted; Such failure to rule in no way modified court procedure, local or federal rules. The reference to such matters to the magistrate is common practice in this district and clearly within my discretion. A motion on Rule 11 sanctions is not within the enumerated motions specifically excepted from those generally referrable to a magistrate under Local Rule 602(A). *See also,* 28 U.S.C. § 636(b)(1)(A). Defendant's motion that I initially consider their motion is denied as moot.

19. ITR and Kondur's successful motion for joint consideration sought that I "defer ruling on their Motions to Dismiss or for Summary Judgment until such time as Magistrate Schauer renders his determination of their Rule 11 Motion". I have, accordingly, so deferred. The order for joint consideration, however, does not alter my role in determining defendants' later motion for reconsideration of magistrate's order; Pursuant to Local Rule 602(B), the magistrate's order must stand unless it is clearly erroneous or contrary to law.

20. Excellair and Moore move to vacate the magistrate's order, rather than have it reconsidered,

## B. MOTION TO RECONSIDER MAGISTRATE'S ORDERS

### 1. *Excellair and Moore*

■ Local Rule 602(C) states

any party seeking reconsideration of a magistrate's order ... must file a motion for reconsideration with the clerk of the district court on or before ten (10) days after the date of the order.

Magistrate Schauer's order was promulgated on February 21, 1986. Defendants filed their motion to vacate magistrate's orders, being treated as one for reconsideration, on March 13, 1986. The ten day motion for reconsideration filing period had clearly expired. The Local Rule's time requirements in seeking review of a magistrate's orders are not to be ignored. If violated they may result in the preclusion of reconsideration. *See Donovan v. Gingerbread House, Inc.*, 106 F.R.D. 57, 58 (D.Colo.1985).

■ Defendants could have moved for an extension of time in which to file the motion, or somehow exhibited a good faith attempt to comply with the Local Rules, but chose not to. Accordingly, Excellair and Moore's motion for reconsideration of magistrate's order is denied.

### 2. *ITR and Kondur*

Local Rule 602(B) states that

... the decision of the magistrate shall be final, subject only to reconsideration by the district judge on a showing that a magistrate's order is *clearly erroneous or contrary to law.*

(Emphasis added.)

■ Defendants' motion charges that the government intentionally mislead the court in so far as it alleges 1) ITR obtained all or virtually all of Excellair's assets (¶¶ 27 and 33(a), First Amended Complaint), and 2) such acquisition of assets caused Excellair's non-performance on the FAA-guaranteed loans, (¶¶ 34 and 38, First Amended Complaint).

Fed.R.Civ.P. 11 provides

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law ... and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or increase in the cost of litigation

Defendants attest that documents in the government's possession at the time the amended complaint was filed prove that in May, 1984 the government obtained all of Excellair's aircraft and engines and numerous spare parts. Exhibits A, B, E, and F to defendants' Rule 11 motion. This fact is *not* disputed by the government.

Defendants contend that the government's knowledge that it seized these assets from Excellair leads to the conclusion

---

apparently on the ground that the magistrate was without jurisdiction or that he improperly considered Excellair and Moore's Rule 11 motion in conjunction with ITR and Kondur's substantially identical one.

As I've noted above, *see* footnote 18, defendants' Rule 11 motion was properly before the magistrate. My failure to have denied defendants' motion that I consider their sanctions motion earlier does not vitiate my reference of this issue to the magistrate, his jurisdiction, nor the decision he reached.

Excellair and Moore were not represented by counsel at the July 12, 1985 hearing on ITR and Kondur's sanctions motion. The transcript of the procedings evinces as much. However, the magistrate is not precluded from ruling on Excellair and Moore's motion without a hearing, which is granted on a discretionary basis. This

is especially the case where ITR and Kondur's motion which was argued orally is functionally identical, with only minor variations, to Excellair and Moore's motion. In fact, Excellair and Moore incorporated ITR and Kondur's arguments into their brief. As well, Excellair and Moore's Rule 11 motion and supporting briefs were submitted on June 26, well before the July 12 hearing. By the time Magistrate Schauer produced a written order on February 21, 1986, supplemental authority filed September 10 and 28, 1985, in support of ITR and Kondur's sanctions motions and in opposition to the government's cross-motion for sanctions was also considered.

Excellair and Moore's motion to vacate is improper. I will however, in deference to these defendants, consider their motion as one for reconsideration of magistrates orders.

that the above referenced allegations in the amended complaint could not be to the best of government counsel's "knowledge, information and belief formed after reasonable inquiry" nor have been "well grounded in fact".

Magistrate Schauer ruled

After·review of the pleadings, motions, briefs, and oral arguments, it appears that the allegations in the Amended Complaint that are the subject of defendants' motions for sanctions are a *matter of proof and interpretation,* and clearly cannot be regarded as not "well grounded in fact".

(Emphasis added.)

"This ruling", defendants argue, "is clearly erroneous since it completely disregards the government's admission of the facts ...". Motion for reconsideration at 2. I agree with defendants that the magistrate's ruling was in error, but only in part.

Clearly, if the government had obtained all of Excellair's aircraft and engines and numerous spare parts, ITR could not have acquired all or virtually all of Excellair's assets. Paragraph 22 of the Amended Complaint states that only a "substantial portion" of Excellair's assets were transferred to ITR. While this language might create confusion, it does nothing to detract from the force and effect of the government's disingenuous use of "all" in paragraphs 27 and 33(a). Language can paint a precise definite fine stroke or an imprecise indefinite broad swath. When it is a broad swath, such as the word "substantial", its meaning, as noted by the magistrate, is a matter of interpretation. However, when the word is a precise fine stroke, such as "all", its meaning is manifest without interpretation. All is everything and nothing less. ITR received less than everything of Excellair's assets. The government's stating that ITR received all of Excellair's assets is, by the government's admission, simply an untruth.

The government asserts that its belief that all Excellair's assets had been conveyed to ITR was reasonably based on promissory notes and bills of sale between Excellair or Omnet and ITR. The promis-

sory notes, referrable to the May, 1984 loan transactions/ruse reflect ITR's having a security interest in substantially all of Excellair's assets. Counsel's perusal of these documents, the government argues, constitutes reasonable inquiry. I disagree. It is unreasonable for the government to rely on promissory notes evincing a broad security interest of ITR when the government also knew that said security interest was never realized. The documents relied upon by the government are not probative of what was *actually transferred.* The government knew the promissory notes to be an inaccurate reflection of reality in light of the government itself having acquired the bulk of Excellair's assets.

 The magistrate's ruling is correct, however, in so far as the government's assertion that the transfer of assets to ITR caused Excellair's non-performance of its loan obligations *is* a "matter of proof and interpretation". The government's claims are not necessarily eviscerated by ITR's receiving only a portion, rather than all, of Excellair's assets. For example: What *was* conveyed ITR might still have been done fraudulently; the acquisition of only some of Excellair's assets might still have been done with the intent to, and the effect of, restraining trade; ITR and Kondur's involvement with Excellair might still have caused the latter's non-performance of its loan obligations. These are questions of fact. As Magistrate Schauer perceptively noted, "Rule 11 was not designed for the purpose of factual resolution appropriately left for trial".

Accordingly, ITR and Kondur's motion for reconsideration of Magistrate Schauer's order is granted with respect to the government's contention that ITR obtained "all" of Excellair's assets. The motion is otherwise denied.

## C. SANCTIONS

If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, *shall* impose upon the person who signed it, a represented party, or both, an appro-

priate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Fed.R.Civ.P. 11 (emphasis added).

### 1. Government

 Since I find the government's contention that ITR obtained all of Excellair's assets violative of Rule 11, I must impose sanctions. The type of sanctions to be imposed however, is entirely within my discretion. *See* C. Wright, A. Miller and M. Kane, *Federal Practice and Procedure,* § 1334 (1986 supp.).

 I find an appropriate sanction to be the striking of all reference in the pleadings to ITR's obtaining all or virtually all of Excellair's assets. I do not believe a monetary sanction is appropriate because a substantial portion of the defendants' efforts to persuade me of the government's Rule 11 violation was directed toward the government's claim that ITR's acquisition of assets caused Excellair's non-performance of the loan contracts. As noted above, these efforts were unsuccessful.

### 2. Defendants

 After denying defendants' Rule 11 motions, Magistrate Schauer held that the government's Rule 11 motion, alleging that defendant's motions were meritless, frivolous, spurious, harrassing, intimidating, dilatory and calculated to increase litigation costs unnecessarily and obtain privleged information, "may have merit". On this basis, the Magistrate deferred ruling on the government's motion until the conclusion of this litigation.

I have ruled today that government counsel did violate Rule 11 in pleading that ITR had received all of Excellair's assets. Defendant's motion, therefore, is not frivolous and does have merit. Accordingly, the government's Rule 11 motion that the defendants' Rule 11 motion was interposed for an improper purpose is denied. This denial of the government's Rule 11 motion is an appropriate exercise of my "inherent power to rehear or reconsider any matter

*sua sponte"* which has been referred to a magistrate. Local Rules 602(B).

It is hereby ORDERED that

1. All defendants' motions for summary judgment or dismissal are denied;

2. Excellair and Moore's motion

 a. for consideration by this court of their Rule 11 motion is denied as moot; and

 b. to vacate magistrate's order is denied;

3. ITR and Kondur's motion for

 a. Reconsideration of Magistrates Order is granted; and

 b. Rule 11 sanctions is granted in part; any reference to ITR obtaining all or virtually all of Excellair's assets in any document submitted in this case is hereby stricken;

4. The governments cross-motion for Rule 11 sanctions is hereby denied.